IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AMAURY HERNÁNDEZ-RODRÍGUEZ [2], <br><br> Defendant. | CRIM. NO. 20-233 (SCC) |

**OPINION AND ORDER**

After thirty hours in a small vessel and another twelve on land, Amaury Hernández-Rodríguez initialed, wrote on, and signed a *Miranda* waiver that lists his rights, says that he understands them, and states that he is nonetheless willing to answer questions without a lawyer present. Two interviews followed. Now he moves to suppress his statements on the ground that his waiver was neither knowing nor voluntary. After considering the testimony presented during the suppression hearing, we disagree. Thus, we deny his motion.

I. SUPPRESSION HEARING

From a bird's eye view, Mr. Hernández-Rodríguez contends that his *Miranda* waiver was not knowing and

voluntary because no one explained his rights to him, he did not read the waiver form, he was seasick and dehydrated when he signed it, and someone told him that no drug charges would be filed against him if he talked. At the suppression hearing, a paramedic who claims to have treated him, the agent who interviewed him, and Mr. Hernández-Rodríguez testified. Before beginning our analysis, we recount their testimony and make a few factual findings.

Mr. Hernández-Rodríguez testified that he is from the Dominic Republic and wanted to come to Puerto Rico for better economic opportunity. Docket No. 100, pgs. 128–29. One day, he heard about someone who could give him passage. *Id.* at 130. In the late-night hours of July 15, he paid his fare and stepped into a small vessel. *Id.* at 137. The choppy seas made him sick and afraid. *Id.* at 137–38. Afraid, he said, because at one point he thought that the vessel would sink. *Id.* at 138. Though he brought water, he felt too sick to drink it. He vomited several times during the journey. *Id.* at 138–39.

When the vessel got close to Puerto Rico, its occupants saw a U.S. Coast Guard ship. To avoid detection, the captain

turned off the engine and let the vessel drift. But to no avail. Once it was clear that the U.S. Coast Guard would intercept them, someone told the passengers to move towards one area of the vessel so that that no one could identify the captain. *Id.* at 139. Then someone threatened to kill Mr. Hernández-Rodríguez and his family if he revealed any information. *Id.* at 140. The U.S. Coast Guard interdicted the vessel around 3 a.m. on July 17. *Id.* at 97.

The witnesses' stories diverge upon Mr. Hernández-Rodríguez's arrival in Puerto Rico. He stated that he was feeling seasick and that no one examined him. *Id.* at 141–42. A paramedic, Manuel Guerrero-Laboy, testified otherwise. He said that around 6:30 a.m., he encountered five people who had been aboard the small vessel. *Id.* at 16–17. He tended to all five of them, and only one—Mr. Ledesma—mentioned that he felt unwell. *Id.* at 17. He took their vital signs and checked them for dehydration. *Id.* at 18–20. None showed signs of dehydration, *id.* at 20, and none were disoriented, *id.* at 26. He spent approximately ten minutes with each of the four who said that they felt fine and approximately fifteen to twenty

minutes with Mr. Ledesma. *Id.* at 55–56. We admitted into evidence Government Exhibit 1, a photo that the paramedic stated depicted the five people he had treated. *Id.* at 25–26. The interviewing agent, Special Agent Sandro Luna, said that one of those people is Mr. Hernández-Rodríguez and identified him in Court. *Id.* at 71–72.

Now to the interviewing agent's testimony. The agent said that he met Mr. Hernández-Rodríguez at a Drug Enforcement Administration ("DEA") division office. *Id.* at 72. When he and his four companions arrived there, the agent's team processed them. *Id.* at 73. The processing area is spacious and air conditioned. Within that area, there are holding cells with benches, restrooms, and water. *Id.* at 77. The agent observed that Mr. Hernández-Rodríguez did not appear sick and was alert and able to walk without assistance. *Id.* at 73–74. He did not appear to be injured either. *Id.* at 75. The agent also noted that he followed instructions, did not request medical attention, and did not complain about any pain. *Id.* at 76. And he personally saw someone from his team handing out food and water to them. *Id.* at 78–79.

The agent testified that he interviewed Mr. Hernández-Rodríguez twice. Both took place in a smaller room with a table and a few chairs. *Id.* at 79, 92. The first began around 6:30 p.m. *Id.* at 77. At the beginning of the interview, the agent noticed that Mr. Hernández-Rodríguez looked nervous but otherwise fine. *Id.* at 78. He did not appear to be dehydrated or uncomfortable. *Id.* The agent recalls reading each of his *Miranda* rights to him from a waiver form and asking him to initial each sentence. *Id.* at 80. He nodded his head in agreement as his rights were read to him, initialed, and signed the form. *Id.* And he wrote out "yes" next to the statements that say that he understands his rights and that he is willing to answer questions without a lawyer present. *Id.* at 84. He was coherent and did not slur his speech when he answered questions. *Id.* at 80–81. The agent added that he is certain that he understood his rights and that he spent between five and seven minutes explaining them to him. *Id.* at 123–24.

We admitted into evidence a copy of the *Miranda* waiver form as Government's Exhibit 2-A (and 2-B, its English-language translation, Docket No. 104-1), which the

agent agreed showed Mr. Hernández-Rodríguez's initials, handwriting, and signature. *Id.* at 83–85. The agent recognized them because he saw him make those marks. *Id.* During the first interview, he never requested medical attention, indicated that he did not feel well, or refused to answer questions. *Id.* at 87–88. Near the end of the interview, the agent offered him a chance to call his mother. *Id.* at 89. The agent overheard the call and noticed that he was responsive and able to hold a back-and-forth conversation. *Id.* at 90. The interview lasted about thirty minutes. *Id.* at 100.

A few hours later, around 9:15 p.m., Mr. Hernández-Rodríguez asked someone who was checking on him if he could speak with the agent again.[1] *Id.* at 91. The agent said yes. Mr. Hernández-Rodríguez was calmer this time and stated that he wanted to provide more details. *Id.* at 93. Like last time, he did not request medical attention, and he did not look sick. *Id.* at 93–94. Though the agent admitted that he told

---

1. Mr. Hernández-Rodríguez does not argue that the agent should have given him a new set of *Miranda* warnings before the second interview. That makes sense because a time gap of a few hours generally requires no renewal. *See, e.g.*, *United States v. Hinkley*, 803 F.3d 85, 92 (1st Cir. 2015).

him—after he had signed the form—that everything would go smoother for him if he was honest and forthcoming, he did not say that no one would file charges against him. *Id.* at 94. The second interview lasted about an hour. *Id.* at 95.

Now back to Mr. Hernández-Rodríguez's testimony. He said that when he arrived at the DEA office he was not feeling well. *Id.* at 142. And when his counsel showed him Government's Exhibit 2-A (the *Miranda* waiver form), he stated that the signature is his, but the other marks (his initials and the yes's) are not. *Id.* at 144–47.[2] No one, he said, read him his rights. He only signed the form because the agent passed it to him and told him to sign it. *Id.* at 145. On cross-examination, he testified that, despite not feeling well at the time, he had a good memory of what had happened to him on the small vessel and when he arrived in Puerto Rico. *Id.* at 151–52. He also said that he did not ask for medical attention when he arrived in Puerto Rico and that he does not

---

2. At the hearing, Mr. Hernández-Rodríguez made much of the fact that there is both blue and black ink on his *Miranda* waiver form. But because all the handwriting that the government attributes to him is the same color, it does not matter that an agent chose to write in a different one.

remember whether the DEA agents offered him food and water. *Id.* at 153. And he agreed that he asked to speak to the agent again after the first interview. *Id.* at 157.

The witnesses' testimonies are all plausible. But after listening to them carefully and observing them, we believe Mr. Guerrero-Laboy's and Special Agent Luna's testimonies. We find that Mr. Guerrero-Laboy examined Mr. Hernández-Rodríguez when he arrived in Puerto Rico and saw no signs of dehydration. We also find that Special Agent Luna spent five to seven minutes reading and explaining his *Miranda* rights to him; that he nodded during this time; and that he signed and initialed the waiver form and wrote yes next to the statements that say that he understands his rights and is willing to answer questions. Finally, we find that the DEA team offered food and water to him, and that Special Agent Luna did not tell him that no drug charges would be filed against him if he talked. With our facts in place, we turn to our analysis.

## II. MOTION TO SUPPRESS

Mr. Hernández-Rodríguez has moved to suppress the statements that he made in those two interviews on the ground that he did not knowingly and voluntarily waive his *Miranda* rights. He did not knowingly waive his rights, he contends, because he did not read the form before he signed it, and no one read it to him. His waiver was not voluntary either, he argues, because he felt unwell and was promised that if he talked no one would file drug charges against him.

First, some basics. *Miranda v. Arizona*, 384 U.S. 436 (1966), requires law enforcement officers, before interrogating a suspect in custody, to appraise him of certain rights to make sure that his Fifth Amendment right against self-incrimination is respected. *United States v. Jackson*, 544 F.3d 351, 356 (1st Cir. 2010). Failure to do so results in suppressing any statements that the suspect made during custodial interrogation. *United States v. Candelario-Santana*, 834 F.3d 8, 18 (1st Cir. 2016). Once a law enforcement officer tells him his *Miranda* rights, the suspect can choose to waive them. A *Miranda* waiver must be made "knowingly, intelligently, and

voluntarily." *United States v. Rang*, 919 F.3d 113, 117 (1st Cir. 2019). The government bears the burden of proving by a preponderance of the evidence that the suspect's waiver was "both 'voluntary in that [it was] the product of a free and deliberate choice rather than intimidation, coercion and deception' and also made with 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon.'" *Id.* (quoting *United States v. Sweeney*, 887 F.3d 529, 536 (1st Cir. 2018)). In deciding whether the government has met this burden, we look to "the totality of the circumstances." *Id.* For only if those show "both an uncoerced choice and the requisite level of comprehension" may we conclude that a suspect has waived his *Miranda* rights. *United States v. Rojas-Tapia*, 446 F.3d 1, 4 (1st Cir. 2006).

To be sure, our analysis of the totality of the circumstances includes the suspect's physical condition and mental state. *Id.* at 7. But it does not end there. *See id.* ("A defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness."); *see also Rang*, 919

F.3d at 118. Voluntariness ultimately turns on whether there is law enforcement "overreaching." *Rojas-Tapia*, 446 F.3d at 7.

The government has met its burden to show by a preponderance of the evidence that Mr. Hernández-Rodríguez knowingly, intelligently, and voluntarily waived his *Miranda* rights. The interviewing agent thoroughly explained his rights to him. And the waiver form accurately lists them. He signed that form, initialed it, and wrote out "yes" next to the statements that say that he understands his rights and that he is willing to answer questions.[3] Although he had been at sea for thirty hours and on land for another twelve before his first interview and felt seasick throughout that time, he did not, as he says, feel so sick as to be unable to understand the nature of his *Miranda* rights and the consequences of waiving them. He did not ask for medical attention, appeared alert, spoke coherently, did not slur his words, followed instructions, nodded along as the agent read and explained his *Miranda* rights to him, answered questions,

---

3. Because we find that no one forged his handwriting, it follows that any attack on his *Miranda* waiver on the ground that someone did fails.

has a detailed recollection of his time on the small vessel and when he first arrived in Puerto Rico, and was able to hold a back-and-forth conversation and accurately explain his situation to his mother. In short, his appearance and behavior indicate that he was fully aware of the nature of the rights he was waiving and the consequences of waiving them.

Mr. Hernández-Rodríguez attacks the validity of his waiver in his supplemental motion to suppress on the ground that "he was made to believe that he was going to be returned to the Dominican Republic without a criminal prosecution for the drugs found in the [small vessel]." Docket No. 95, pg. 4. But Mr. Hernández-Rodríguez did not testify that anyone said that, and we believe Special Agent Luna's testimony that he did not. He testified that he said that things will go smoother for him if he is honest and forthcoming. There is nothing wrong with that. *See United States v. Jacques*, 744 F.3d 804, 809–10 (1st Cir. 2014) ("It is well settled in the First Circuit that an officer does not impermissibly overbear a defendant's will by . . . suggesting that cooperation may lead to more favorable treatment."). And, in any event, he said this *after* Mr.

Hernández-Rodríguez waived his *Miranda* rights.

Mr. Hernández-Rodríguez's last line of attack is that his weakened physical condition (from seasickness, hunger, and dehydration) undercuts the voluntariness of his waiver. Docket No. 65, pgs. 2, 10–11. The problem with this argument is that he does not link his physical condition to any law enforcement misconduct. *See United States v. Carpentino*, 948 F.3d 10, 28 (1st Cir. 2020) ("[A] defendant asserting that a waiver was involuntary on [the basis of a weakened physical condition] must show some form of coercive law enforcement conduct or overreaching."). He presented no evidence that there were any outward signs that he was seasick and dehydrated or that he asked for and was denied food and water. *See id.* To the contrary, the DEA team offered him both. That he might have refused them is on him—not law enforcement. Because he has not shown that law enforcement "either caused or took advantage of his [seasickness or dehydration] in a way that rendered his waiver involuntary," his weakened physical condition is no reason to suppress his statements. *See id.; see also United States v. Acosta-Colón*, 741

F.3d 179, 200 (1st Cir. 2013) (affirming the district court's decision that police did not use any tactics that would undermine the voluntariness of the suspect's confession where the suspect argued that he should have been given something to eat but never asked for food and never complained about being hungry).

### III. CONCLUSION

In sum, the Court denies Mr. Hernández-Rodríguez's motion to suppress his statements (Docket No. 65) because he knowingly, intelligently, and voluntarily waived his *Miranda* rights before making them.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 19th day of August 2022.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE